UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                   :
AHMED M. ELGALAD,                                  :
                                                   :
                                  Plaintiff,       :
                                                   :           17-CV-4849 (VSB)
            - against -                            :
                                                   :        **OPINION & ORDER**
                                                   :
NEW YORK CITY DEPARTMENT OF                        :
EDUCATION, et al.,                                 :
                                                   :
                                  Defendants.      :
                                                   :
-------------------------------------------------------X

<u>Appearances</u>:

Ahmed Elgalad
530 Hughes Street
Northvale, NJ
*Pro se*

Lora Minicucci
Alana Rachel Mildner
New York City Law Department
New York, New York
*Counsel for Defendants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

  Pro se Plaintiff Ahmed Elgalad ("Plaintiff" or "Elgalad") brought this action against the

Board of Education of the City School District of the City of New York, operating as the "New

York City Department of Education," (the "DOE"), Michelle Penn (sued herein as Michelle

Rochon) ("Rochon"), Kabeya Mbuyi ("Mbuyi"), and Livingstone Hilaire (sued herein as

"Hilaire Livingston") ("Hilaire") (the "Individual Defendants" and, together with the DOE,

"Defendants"), asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. §§ 2000e, *et seq*., 42 U.S.C. § 1981 ("§ 1981"), the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law §§ 290, *et seq*., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin Code §§ 8-101, *et seq*., for discriminatory treatment and retaliation against him for reporting discrimination.

Before me is Defendants' motion for summary judgment made pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.   __Background__[1]

Plaintiff is employed by DOE as a teacher.  (Defs. 56.1 ¶ 1.)[2]  He identifies his race as white and his religion as Muslim, (*id.* ¶ 2), and he was raised in Egypt, (Elgalad Ex. N, at 60:17–25).[3]  Plaintiff has mainly taught physical education ("PE"), an area in which he is licensed. (Mildner Decl. Ex. FF),[4] and he taught at DOE's High School for Global Citizenship ("HGSC") in Brooklyn until 2016.  (*See* Defs. 56.1 ¶¶ 3, 5.)  At all relevant times, Rochon was the principal of HSGC, Mbuyi was an assistant principal, and Hilaire was an "Assigned Principal" at HGSC for the 2015–16 school year.  (*Id.* ¶ 3.)

### A.   *Verbal Altercation with Another Teacher and Initial Interactions with Mbuyi and Rochon*

On March 6, 2014, during a HGSC staff meeting, non-party Brittany Chance ("Chance") pointed at Plaintiff and told him to "shush" in front of the other teachers.  (Mildner Decl. Ex. C.) This greatly offended Plaintiff, because in his Egyptian "culture we say shush to animals[,] not

---

[1] Unless otherwise indicated, the facts contained in this section are undisputed.

[2] "Defs. 56.1" refers to Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts.  (Doc. 83.)

[3] "Elgalad Ex." refers to the exhibits Plaintiff filed in opposition to Defendants' Motion for Summary Judgment. (Doc. 85-1.)  Due to a scanning error, Plaintiff's evidentiary submissions are combined together into a single file. (*See* Doc. 88 (letter from Plaintiff to the Court's Pro Se Intake Unit explaining the nature of the error).)

[4] Mildner Decl." refers to the Declaration of Alana R. Mildner in Support of Defendants' Motion for Summary Judgment, (Doc. 82), and the exhibits attached thereto.

[to] human beings." (*Id.*)  Plaintiff told Chance, "if you want to say shush, say it to yourself."

(*Id.*)  This led to a verbal altercation where Plaintiff and Chance accused each other of being

disrespectful.  (*See id.*)  Chance called Plaintiff a "disgusting human," to which Plaintiff said,

"because your head is full of disgusting human, you cannot see the clear human.  You only see

the disgusting one." (*Id.*)

Plaintiff and Chance reported the incident.  Plaintiff believed "Ms. Chance has no

authority to speak to me or any other teacher like that." (*Id.*)  By contrast, Chance and other

teachers present at the staff meeting heard Plaintiff as saying that she was "unclean," rather than

that she was not "clear." (*See* Mildner Decl. Ex. D.)  In her written testimony, Chance stated that

she "felt offended as a black person, as a 'non-muslim' and as a woman." (*Id.*)

On March 12, 2014, Plaintiff and his union representative met with Mbuyi regarding his

exchange with Chance.  (*See* Mildner Decl. Exs. A, D.)  As Plaintiff recalls, Mbuyi told Plaintiff,

"your religion consider[s] everyone not clean and you [to be the] only one clean." (Mildner

Decl. Ex. A, at 68: 7–10.)  Plaintiff disputed this claim about his religion to Mbuyi, which

prompted Mbuyi to say, "If it's not religion, it will be black and white." (*Id.* at 68: 14–15.)  The

union representative advised Plaintiff to file a grievance report against Mbuyi, but Plaintiff

decided not to do so.  (*Id.* at 68:24–69:4.)

On October 1, 2014, Mbuyi observed Plaintiff's PE class and gave him a negative

evaluation over, among other things, the fact that two female students did not complete an

assignment.  (Mildner Decl. Ex. F.)  Plaintiff informed Mbuyi by email, copying Rochon, that

the lack of participation was because one of the students had asthma and felt dizzy, and that,

because Plaintiff's class was doing partnered exercises that day, the other student could not

participate while her partner was ill.  (*See* Mildner Decl. Ex. G.)  Mbuyi summoned Plaintiff to a

disciplinary meeting on October 17, 2014 to respond to Mbuyi's charges related the PE class incident.  (*See* Mildner Decl. Ex. H.)  Mbuyi wrote that the charge was for "failure to provide a safe and orderly environment" and "fail[ure] to inform the administration" of the female student's health problems.  (*Id*.)  The UFT Chapter leader found that Plaintiff had taken reasonable and responsible steps.  (Mildner Decl. Ex. I ("Without clear rules and regulations on what a PE teacher must report I found that Mr. Elgalad had acted in the students [sic] best interest by taking reasonable and responsible steps for her care.").)

On October 27, 2014, Rochon asked Plaintiff to come speak to her.  (Elgalad Ex. Q.)  In this meeting, Rochon asked about the issues between Plaintiff and Mbuyi.  (Elgalad Ex. R.) Plaintiff explained that Mbuyi was "discriminating" against him.  (*Id.*)  As a result, Rochon said that in the future Plaintiff should only deal with her regarding certain matters, not with anyone else at the school.  (*Id.*)  Rochon did not report Plaintiff's allegation of discrimination by Mbuyi, (Elgalad Ex. M, at 65: 4–20), even though the operative DOE regulations require "[s]upervisors" to "immediately report instances of any oral or written complaints of discrimination" to DOE's Office of Equal Opportunity and Diversity Management ("OEO"), (Elgalad Ex. AX, at ELG_00064).

On November 19, 2014, Mbuyi sent Plaintiff an email summoning Plaintiff to his office to discuss "an allegation of verbal assault" arising from an exchange Plaintiff had with a college student who had been volunteering at an event.  (Mildner Decl. Ex. O.)  Plaintiff forwarded this email to Rochon and requested that Rochon, and not Mbuyi, hold the disciplinary conference, because of Plaintiff's belief that Mbuyi "ha[d] been discriminating" against him.  (Elgalad Ex. R.)  Plaintiff was not disciplined in connection with this allegation.  (Mildner Decl. Ex. A, at 156:21–157:10.)

### B.   *Ordered Medical Evaluation of Plaintiff*

According to a signed letter dated November 24, 2014, Rochon requested a medical

evaluation of Plaintiff "to determine his mental and physical capacity to perform his duties" on

the grounds that he "turned red and began to perspire profusely," and because he "repeatedly

demonstrate[d] aggressive behavior towards colleagues."  (Mildner Decl. Ex. Q.)  On February

4, 2015, Rochon was CC'ed on an email that was sent to Plaintiff.  (Elgalad Ex. V.)  The sender

of that email stated:  "Attached, please find your medical appointment."  (*Id.*)  Plaintiff

responded to Rochon that he did "not know . . . the reason for this examination," and in a

February 6, 2015 follow-up email, Plaintiff wrote that an attachment to the February 4, 2015

email had said he should contact his supervisor (i.e. Rochon) regarding the reasons for the

appointment.  (*Id.*)[5]  On February 9, 2015, Rochon wrote to Plaintiff that he could "stop by [her

office] and get a copy of the letter" stating the reasons for the medical evaluation she had

requested.  (Elgalad Ex. W.)

The unsigned January 15, 2015 letter Rochon provided Plaintiff, however, differed from

the signed November 24, 2014 letter requesting the evaluation, stating that Plaintiff:

> repeatedly demonstrates aggressive behavior towards colleagues.  For example,
> during our mid-year conversation he was invading my personal space, pointing
> across my desk, turning red, sweating, and screaming.  I had to alert two male staff
> members and school safety.  I repeatedly asked Mr. Elgalad to take a seat and
> mentioned he was invading my personal space.  The two gentlemen present
> couldn't get through to him.  This has happened numerous times to many
> employees over minor issues.

(Elgalad Ex. Y.)  Plaintiff wrote to his union representative on February 9, 2015 that this

unsigned letter was different from the November 24, 2014 letter Rochon had signed.  (Elgalad

Ex. X.)  Plaintiff also noted that Rochon "refused to sign it" when Plaintiff asked her to do so.

---

[5] The attachment does not appear in the record.

(*Id.*)  On February 18, 2015, a doctor found Plaintiff fit for his employment duties.  (Defs. 56.1 ¶ 8.)

### C.   *Plaintiff's 2014 and 2015 Interactions with Defendants*

Plaintiff filed a report of discrimination against Mbuyi with DOE's Office of Equal Opportunity & Diversity Management ("OEO") on December 8, 2014.  (Mildner Decl. Ex. S.)

On December 15, 2014, HGSC had a class in which a number of students were learning English as a second language.  (Mildner Decl. Ex. U.)  Mbuyi attempted to request that Plaintiff come to the meeting to act as a translator for the students who spoke Arabic as their first language, but Plaintiff did not receive word of the meeting in time and was not able to attend. (*See id.*)  Mbuyi had an assistant in the school's office call Plaintiff to say that Mbuyi wanted to speak with him.  (*Id.*)  Not wanting to be alone with Mbuyi, Plaintiff went to Rochon's office and attempted to call Mbuyi on speaker phone with Rochon present.  (*Id.*)  Plaintiff memorialized this event in an email to Rochon, in which he wrote that "[b]ecause of the discrimination issue I spoke to you about before, I did not want to be alone with Mr. Mbuyi." (*Id.*)

On December 16, 2014, at 10:38 AM, Rochon responded to Plaintiff's email by writing that "[t]he facts down below [in Plaintiff's email] are an inaccurate account of what happened" and that Rochon did not "know what discrimination issue you are talking about."  (Elgalad Decl. Ex. S.)  Shortly thereafter, at 11:10 AM, in response to Plaintiff's December 15, 2014 email to Rochon, Mbuyi responded to Plaintiff and copied Rochon.  (Mildner Decl. Ex. U.)  In his email, Mbuyi wrote that Plaintiff was being summoned to Mbuyi's office to discuss "an allegation [of] insubordination."  (*Id.*)  Mbuyi's response email is immediately above Plaintiff's December 15, 2014 email to Rochon, even though Plaintiff did not copy Mbuyi on the initial email to Rochon.

(*See id.*)  By written notice from Mbuyi dated December 22, 2014, Plaintiff was informed that the charge of insubordination had been "dropped."  (Mildner Decl. Ex. V.)

On February 17, 2015, OEO investigators met with Rochon regarding Plaintiff's OEO complaint against Mbuyi.  (Elgalad Ex. BB.)  Rochon told the investigators that she "knew of no conflict" between Plaintiff and Mbuyi.  (*Id.*)  On March 4, 2015, OEO interviewed Mbuyi, who was accompanied by a union representative, in connection with the OEO complaint that Plaintiff had filed against him.  (Elgalad Ex. DD.)

In a letter dated June 1, 2015 that was added to Plaintiff's employee file, Mbuyi stated that he had determined that Plaintiff had "committed an act of verbal abuse" against a student back in October of 2013.  (Mildner Decl. Ex. W.)  These allegations were part of a DOE Office of Special Investigations ("OSI") case about Plaintiff regarding whether, in October 2013, Plaintiff had called a student "stupid."  (*See* Elgalad Ex. F.)  On March 2, 2015, after Rochon asked Mbuyi why he had not closed out this OSI case, Mbuyi wrote that "[s]tudents in that class (fall 2013) do not recall anything about the incident."  (*Id.* at P-238.)  Subsequently, on March 16, 2015, Mbuyi wrote that he had "received two statements from students" concerning the OSI case.  (*Id.* at P-240.)  On an OSI form dated March 19, 2015, Mbuyi wrote concerning the OSI case that "the allegation was unsubstantiated," and that "there is no evidence that [Plaintiff] did in fact call the student stupid" but that he "could have possibly done so," and that it "could easily be a miscommunication."  (Elgalad Ex. G, at P-241, P-244.)  However, Mbuyi checked the box on the OSI form stating that "the allegation(s) of verbal abuse were substantiated."  (*Id.* at P-244.)  Attached to the form is a statement from a student, dated October 17, 2013, stating that "Mr. E had called me stupid."  (*Id.* at P-249.)

On June 17, 2015, Plaintiff filed an administrative proceeding to remove the June 1, 2015

letter from his employment file.  (Elgalad Ex. I.)  On December 28, 2015, the June 1, 2015 letter

was removed from Plaintiff's employment file.  (Mildner Decl. Ex. Y.)

On October 16, 2015, Hilaire observed one of Plaintiff's classes and rated him as

"ineffective" in five categories.  (Mildner Decl. Ex. AA.)  On December 7, 2015, Rochon

observed one of Plaintiff's classes and also gave him low marks in three categories.  (Mildner

Decl. Ex. BB.)  On December 9, 2015, Plaintiff and Rochon met in her office to discuss the

results of her observations.  (Mildner Decl. Ex. CC.)  During this meeting, Rochon and Plaintiff

got into a verbal dispute.  (*Id.*)  Plaintiff believed Rochon to be ignoring him and looking at her

phone, and he recalls saying "Mrs. Rochon, can you please pay attention to me."  (*Id.*)  Rochon

told Plaintiff she felt disrespected and asked him to leave her office.  (*Id.*)  Subsequently, Rochon

scheduled a meeting with Plaintiff on December 14, 2015, and told Plaintiff to bring his union

representative to the meeting.  (Mildner Decl. Ex. DD.)  That meeting was apparently held on

December 14, 2015.  (MSJ Opp. 13.)[6]

### D.    *Plaintiff's 2016 Interactions with Defendants*

Sometime around March of 2016, Hilaire told Plaintiff, "listen, you have to go and stop .

. . you[r] [discrimination] . . . fil[ing] against Mr. Mbuyi."  (*See* Mildner Decl. Ex. B, at 22:4–

23:14.)  Plaintiff responded that he would not cease pursuing his discrimination charge against

Mbuyi.  (*Id.*)  Plaintiff also recalls that, during this conversation, Hilaire told Plaintiff that

"[n]othing" Plaintiff did would "affect Ms. Rochon," and that, if he pursued his charges against

Rochon, "we will get you."  (Mildner Decl. Ex. QQ, at ELGALAD_D001398–99.)

On March 23, 2016, DOE issued a notice of a grievance conference to be held on March

---

[6] "MSJ Opp." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary
Judgment.  (Doc. 85.)  Neither party provides details concerning what transpired during this meeting.

28, 2016 regarding a grievance Plaintiff had filed concerning "class coverages." (Pl. 56.1 ¶ 34.)[7]
Rochon was notified of the grievance conference. (*Id.*) Rochon participated by phone, and the
day after the conference, on March 29, 2016, Rochon sent Plaintiff six summonses for
disciplinary conferences, all of which were scheduled for March 31, 2016. (*Id.* ¶ 35.)

On April 6, 2016, Rochon conducted an observation of one of Plaintiff's classes. (*Id.* ¶
36.) On April 8, 2016, Rochon sent Plaintiff two more summonses for disciplinary conferences.
(*Id.* ¶ 37.) Also on that same day, Rochon issued four letters to Plaintiff's employee file, all of
which conclude "[t]his incident may lead to further disciplinary action, including charges that
may lead to termination of your employment." (Elgalad Ex. OO.) On April 19, 2016, after
another conference in her office, Rochon issued another letter to Plaintiff's file with the same
concluding sentence. (Elgalad Ex. UU.)

On April 18, 2016, Mbuyi summoned Plaintiff to a disciplinary conference on April 20,
2016, following a verbal dispute the two had when Mbuyi came to Plaintiff's class to talk to one
of Plaintiff's students. (Pl. 56.1 ¶ 39; Elgalad Ex. AD.) At the end of the school day, Mbuyi
called the student to Plaintiff's office to ask her if something had happened with Plaintiff and to
ask that she "write a statement" about Plaintiff. (Elgalad Ex. AF, at 265:4–25.)[8] On April 20,
2016, Mbuyi summoned Plaintiff to another disciplinary conference set for April 22, 2016
concerning the allegation that Plaintiff had questioned a student about whether the student had
given a written statement to Mbuyi about Plaintiff. (Pl. 56.1 ¶ 41; Elgalad Ex. AH.) However,
later that day at 9:01 PM, Mbuyi cancelled the disciplinary conference. (Elgalad Ex. AH.)

---

[7] "Pl. 56.1" refers to Plaintiff's Response to Defendants' Local Rule 56.1 Statement and Further Statement of
Material Facts in Opposition to Defendants' Motion for Summary Judgment. (Doc. 86.)

[8] Although the nature of Plaintiff's interaction with the student is not material to my resolution of the motion before
me, from the record, it appears that Mbuyi spoke to the student waitlisted for college, and that afterwards, Plaintiff
either questioned her about what she had said to Mbuyi or told the student not to interrupt class with long
conversations. (*See* Elgalad Exs. AD, AE, AH.)

Approximately one hour later at 10:24 PM, Mbuyi filed a Corporal Punishment Intake Form with OSI over the allegation that Plaintiff questioned the student for making a written statement to Mbuyi regarding Plaintiff.  (Pl. 56.1 ¶ 42.)  On April 22, 2016, Mbuyi sent Elgalad another email summons for a disciplinary conference, this time set for May 2, 2016, over the same allegation that Plaintiff questioned the student.  (Elgalad Ex. AL.)

### E.   *Administrative Charges Against Plaintiff*

On June 22, 2016, Plaintiff was served with charges against him to be adjudicated in a hearing before a DOE hearing officer.  (Mildner Decl. Ex. MM.)  There were five charges (deemed "specifications" in the administrative record), which included:  (1) that Plaintiff called a student "stupid" in 2013;[9] (2) Plaintiff's failure to maintain accurate time and attendance records; (3)–(4) two separate charges for arriving to work late; and (5) Plaintiff's questioning of the student about whether she had provided Mbuyi with a written statement about Plaintiff.  (Mildner Decl. Ex. LL, at Elgalad_D000325–26.)  Plaintiff was adjudicated as having been late to work and having inappropriately questioned the student, and as a result, he was fined $1,000.  (*Id.* at Elgalad_D000336.)

### F.   *Plaintiff's Reassignment to Absence Teacher Reserve Duty*

By a letter dated November 3, 2016, Plaintiff was reassigned to teach as part of the Absent Teacher Reserve ("ATR").  (Mildner Decl. Ex. NN.)[10]  In this role, Plaintiff receives the same compensation, but he "do[esn't] have classes" or "a vacancy" or "a school," and "[s]ometimes" he is assigned to "a school" that is in Brooklyn far from Plaintiff's home in New Jersey.  (Mildner Decl. Ex. A, at 203:8–204:7.)

---

[9] This is the same charge which resulted in the June 1, 2015 letter to Plaintiff's file which was eventually removed from his file after adjudication.  *See supra* Pt. I.C.

[10] Mildner Decl. Ex. NN refers to the "Absence Teacher Reserve", which appears to contain a typographical error.

## II.    <u>Procedural History</u>

Plaintiff filed his initial complaint in this matter on June 27, 2017.  (Doc. 1.)  On January 12, 2018, Plaintiff filed his Amended Complaint.  (Doc. 21.)  Following briefing, on September 24, 2018, I entered an Opinion & Order granting in part and denying in part Defendants' motion to dismiss Plaintiff's Amended Complaint.  (Doc. 30.)  After that Opinion & Order, Plaintiff's remaining claims in this action are his § 1981 claims against DOE and Mbuyi, and his NYSHRL and NYCHRL claims against the Individual Defendants.[11]  (*See id.*)

Discovery in this action concluded on March 31, 2021, after the parties received numerous extensions of the discovery deadlines.  (Docs. 49, 51, 55, 61, 65.)  On April 26, 2021, I set a briefing schedule for summary judgment.  (Doc. 78.)  Defendants filed their motion for summary judgment and the papers supporting it on July 23, 2021.  (Docs. 81–84.)  Plaintiff filed opposition papers on August 30, 2021.  (Docs. 85–87.)  Defendants filed a reply brief on October 4, 2021.  (Doc. 92.)

## III.    <u>Legal Standards</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is

---

[11] On July 8, 2020, Defendants filed a notice pursuant to Federal Rule of Civil Procedure 25(a)(1) stating that they believed that Hilaire had passed away.  (Doc. 52.)  To date, no motion has been made to substitute in a proper party in Hilaire's place.  Pursuant to Federal Rule of Civil Procedure 25(a)(1) "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party.  A motion for substitution may be made by any party or by the decedent's successor or representative.  If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed."  Therefore, this action is dismissed as to Hilaire.

"material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256 (citation omitted), and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

In considering a summary judgment motion, a court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the

record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

In addition, courts must exercise "an extra measure of caution" in determining whether to grant summary judgment in employment discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotation marks omitted). Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

## IV.   Discussion

### A.   *The § 1981 Claims*

#### 1.   Applicable Law

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This section outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment. *See, e.g.*, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68–69 (2d Cir. 2000). In order to make out a claim for individual liability under § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action. . . . [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." *Id.* at 75 (internal citation and quotation marks omitted).

When a plaintiff asserts a claim "for violation of the rights guaranteed in § 1981 by state

governmental units," "the express cause of action for damages created by [42 U.S.C.] § 1983 ["(§ 1983")] constitutes the *exclusive federal remedy*." *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) (emphasis in original) (quoting *Jett v. Dallas Independent School District*, 491 U.S. 701, 733 (1989)).  Because of this, even "if [a court] construe[s] [a plaintiff]'s § 1981 claims" against a state governmental unit as claims "brought under § 1983," those claims will "fail" unless the plaintiff "allege[s] that the 'challenged acts were performed pursuant to a municipal policy or custom,' as required to maintain a § 1983 action against a municipality." *Id.* at 621 (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)).  Moreover, "§ 1981 does not provide a separate private right of action against state actors." *Id.*  Courts in this circuit tend to construe claims against "individuals sued in their individual capacities who are also state actors" as claims under § 1983, rather than claims under § 1981. *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 285 (S.D.N.Y. 2019); *Whaley v. City Univ. of New York*, 555 F.Supp.2d 381, 400-01 (S.D.N.Y. 2008).[12]

In my Opinion & Order on the motion to dismiss in this action, I stated that "[a] municipality, or municipal agency such as the DOE, may be held liable under § 1981 only if a plaintiff's injury is the result of municipal policy, custom, or practice. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Patterson*, 375 F.3d at 226.  To maintain a claim, a plaintiff must allege '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir.

___

[12] The Second Circuit has indicated in several opinions that the above interpretation of *Duplan* is correct.  *See Smalls v. Collins*, 10 F.4th 117, 144 (2d Cir. 2021) (affirming the district court's dismissal of Plaintiff-Appellant's § 1981 claims on the grounds that "42 U.S.C. § 1983 provides the sole cause of action available against state actors alleged to have violated § 1981.") (internal quotation marks and citation omitted); *Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 F. App'x 536, 540 & n.1, n.3 (2d Cir. 2020) (analyzing a § 1981 claim brought against plaintiff's supervisor at his municipal government employer as a claim under § 1983); *Collymore v. City of New York*, 767 F. App'x 42, 45 n.2 (2d Cir. 2019) (concluding that the district court properly construed § 1981 claims against individual defendant employed by public university as § 1983 claims).

1995) (internal quotation marks omitted)." *Elgalad v. N.Y.C. Dep't of Educ.*, 17-CV-4849 (VSB), 2018 WL 4572237, at *10 (S.D.N.Y. Sept. 24, 2018).  I went on to state that "[c]ourts in this Circuit routinely find" *Monell* liability on the notion "that 'a public school principal may be a final policymaker where the harm that befell the plaintiff was under the principal's control. . . .'" *Id.* (quoting *Vasquez v. N.Y.C. Dep't of Educ.*, No. 11-cv-3674 (AJN), 2015 WL 3619432, at *11 (S.D.N.Y. June 10, 2015), *aff'd*, 667 F. App'x 326 (2d Cir. 2016)).

However, since I issued that decision, the Second Circuit abrogated my above-statement of law.  For *Monell* liability to attach, "the official must have been sufficiently high up in the municipal hierarchy that he was responsible under state law for making policy in that area of the municipality's business," meaning that governing state law must have vested the official with "authority to adopt rules for the conduct of the municipal government."  *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (internal quotation marks, citations, and alteration marks omitted).  The Second Circuit explained that courts cannot "equat[e] a principal's final decisions with a municipality's final policies," and that, at least under present law, "a New York City principal does not have municipal policymaking authority for *Monell* purposes."  *Id.* at 100–101.

### 2.   Application

Here, even construing Plaintiff's § 1981 claim against DOE as one brought pursuant to § 1983, *see Duplan*, 888 F.3d at 621, the record does not reflect any applicable policy or custom that would allow for liability against DOE.  The only route to *Monell* liability for DOE would be under the pre-*Agosto* regime where "a public school principal acts as a final policymaker," (*see* MSJ Opp. 26), but after *Agosto* this is no longer viable.  Therefore, the remaining § 1981 claim against DOE must be dismissed.

Plaintiff's § 1981 claim against Mbuyi fails for the same reason.  Because § 1981 claims

against individual defendants who act through their roles in public employment are construed as § 1983 claims under *Duplan*, *see Sooroojballie*, 816 F. App'x at 540 n.1; *Collymore*, 767 F. App'x at 45 n.2, Plaintiff would have to show that Mbuyi's actions were taken pursuant to a municipal policy or custom.  As noted, no policy viable under *Agosto* is in the record.  Therefore, the § 1981 claim against Mbuyi must also dismissed.

**B.**     ***The NYCHRL and NYSHRL Claims Against Rochon, Mbuyi, and Hilaire***

**1. Discrimination Claims**

a.   <u>Applicable Law</u>

Discrimination claims under the NYSHRL are analyzed using the three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ferraro v. Kellwood Co*, 440 F.3d 96, 99 (2d Cir. 2006) ("In discrimination claims brought under the [NYSHRL], the burden-shifting framework established by the Supreme Court in *McDonnell* . . . applies.").  NYCHRL discrimination claims follow a similar three-step burden-shifting framework, but because the NYCHRL is to be construed more "broadly in favor of discrimination plaintiffs" than are its federal and state law counterparts, the content of the steps is somewhat different.  *See Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (citation omitted); *Marseille v. Mount Sinai Health Sys., Inc.*, 18-CV-12136 (VEC), 2021 WL 3475620, at *11 (S.D.N.Y. Aug. 5, 2021) (describing the three-step burden-shifting analysis for an NYCHRL claim); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013) ("It is unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims.").

At step one, the employee bears the burden of setting forth a prima facie case of discrimination.  *See McDonnell Douglas*, 411 U.S. at 802.  The "burden of establishing a *prima*

*facie* case is *de minimis*." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (collecting cases).  To set forth a prima facie case of discrimination under the NYSHRL, a plaintiff must show (1) she belongs to a protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  *See id.*  To meet the third element, the "adverse employment action" must be "material," meaning it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (internal quotation marks omitted).  "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Id.* (internal quotation marks and alteration omitted).  By contrast, "[t]he application of [workplace] disciplinary policies to [an employee], without more, does not constitute adverse employment action."  *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).  Similarly, negative workplace evaluations do not constitute adverse employment actions unless they have some "effect on the terms and conditions of . . . employment."  *Sanders v. N.Y.C. Human Res. Admin.,* 361 F.3d 749, 756 (2d Cir. 2004).

Unlike the NYSHRL, "the NYCHRL does not require . . . materially adverse employment actions," *Mihalik*, 715 F.3d at 114 (citation omitted), and instead requires a plaintiff to show that "(1) 'she is a member of a protected class'; (2) 'she is qualified for her position'; (3) she 'was treated differently from others in a way that was more than trivial, insubstantial, or petty'; and (4) that she 'was treated differently than a worker who was not a member of [her] protected class.'"  *Marseille*, 2021 WL 3475620, at *5 (quoting *Maynard v. Montefiore Med.*

*Ctr.*, No. 18-CV-8877 (LAP), 2021 WL 396700, at *5 (S.D.N.Y. Feb. 4, 2021)).  However, even under its more liberal notion of liability, "the NYCHRL . . . is not a general civility code, and petty slights and trivial inconveniences are not actionable." *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 450 (E.D.N.Y. 2013) (citation omitted); *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 80 (1st Dep't 2009) ("comments" that are "nothing more than petty slights or trivial inconveniences . . . are not actionable.").

At step two, "[o]nce a plaintiff has made out a prima facie case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its conduct." *Feingold*, 366 F.3d at 152 (citation omitted).  This step is the same for defendants under either the NYSHRL or the NYCHRL.  *Compare id. with Chen*, 805 F.3d at 75–76 (explaining that under the NYCHRL, "the plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions.").  The defendant's burden at this stage is "light." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).  This burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  To succeed at this stage, "the defendant need not persuade the court that it was actually motivated by the proffered reasons. . . .  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).

If the employer carries this burden, then at step three, for an NYSHRL claim, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold*, 366 F.3d at 152.  Similarly, at step three,

for a NYCHRL claim, a plaintiff must "show[] that the employer's stated reason" for its action was "entirely pretextual, or that the employer had mixed motives, one of which was to discriminate." *See Chen*, 805 F.3d at 76, n.13.  In other words, an NYCHRL plaintiff must show the treatment she faced was "because of a discriminatory intent." *Mihalik*, 715 F.3d at 110.

In general, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims" in order to ensure they effectuate the NYCHRL's "broader . . . standards." *Id.* at 109.  Where a NYCHRL claim fails, however, a "similarly-premised NYSHRL claim[] will also fail, because the NYCHRL provides a broader basis for liability than the NYSHRL does." *Atkinson v. Singh*, 19-CV-3779 (VSB), 2022 WL 137634, at *16 (S.D.N.Y. Jan. 14, 2022) (alteration marks omitted) (collecting cases).  A claim that "survive[s] the higher standard required under" the "NYSHRL" will "also survive under the NYCHRL." *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 394 (S.D.N.Y. 2019).

### b.  Application

I will begin by assessing the NYCHRL discrimination claim.  Defendants agree that Plaintiff meets the first two elements of the prima facie case for the NYCHRL claim, but dispute whether Plaintiff suffered any employment action that rises to the level of being "materially adverse."  (MSJ 13.)[13]  However, because "the NYCHRL does not require . . . materially adverse employment actions" as part of the prima facie case, *Mihalik*, 715 F.3d at 114 (citation omitted), the parties' dispute as to whether Plaintiff suffered an adverse employment action is irrelevant as to the NYCHRL claim.

With that said, Plaintiff's NYCHRL prima facie claim fails because there is no evidence "sufficient to create a genuine question of fact whether any similarly situated colleague was

---

[13] "MSJ" refers to the Memorandum of Law in Support of Defendants' Motion for Summary Judgment.  (Doc. 84.)

treated different from Plaintiff." *Marselle*, 2021 WL 3475620, at *5; *Henderson v. Physician Affiliate Grp. of N.Y. P.C.*, No. 18-CV-3430, 2019 WL 3778504, at *5 (S.D.N.Y. Aug. 12, 2019) (holding that plaintiff failed to make a prima facie case absent evidence of particular comparators and specific facts demonstrating differential treatment).  Nothing in the record suggests that any of Plaintiff's non-Egyptian or non-Muslim colleagues were subjected to different workplace discipline under circumstances similar to those that led to Plaintiff's being disciplined.  For example, the record shows that Plaintiff was called to a disciplinary meeting after he did not appear to translate a class for Arabic-speaking students.  (Mildner Decl. Ex. U.)  Plaintiff contends that he was given only "ten minutes" notice, which was insufficient, whereas teachers who spoke other languages were given notice sufficient to allow them to show up to translate the class.  (*Id.*)  The fact that other teachers showed up to the class says nothing about the sort of notice they received, or, more critically, whether non-Arabic-speaking teachers were ever subjected to discipline—or spared discipline—under any circumstances similar to those that led to discipline for Plaintiff.  Plaintiff identifies nothing at all about discipline that befell other teachers at HGSC, and my independent review of the record turned up nothing relevant about other teachers that could speak to discriminatory treatment.

As such, because there is no "evidence that [Plaintiff] has been treated less well than other employees," *Mihalik*, 715 F.3d at 110, the NYCHRL discrimination claims must be dismissed.  As a result, Plaintiff's "similarly-premised NYSHRL claim[] [must] also" be dismissed.  *See Atkinson*, 2022 WL 137634, at *16.

### 2. Retaliation Claims

#### a.  Applicable Law

As with discrimination claims, NYSHRL and NYCHRL "retaliation claims are reviewed

under the burden-shifting approach" described *supra*.  *Schaper*, 408 F. Supp. 3d at 390

(NYSHRL retaliation) (citing *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013));

*Marseille*, 2021 WL 3475620, at \*11 (NYCHRL retaliation).  A plaintiff establishes a prima

facie case of retaliation under the NYCHRL by showing:  (1) that she engaged in a protected

activity; (2) that her employer knew of the protected activity; (3) that her employer "took an

employment action that disadvantaged the plaintiff *in any manner*"; and (4) a causal connection

between the protected activity and the negative employment action.  *Corrado v. N.Y. Unified Ct.

Sys.*, 163 F. Supp. 3d 1, 25–26 (E.D.N.Y. 2016) (emphasis in original) (quoting *Sletten v.

LiquidHub, Inc.*, No. 13-CV-1146, 2014 WL 3388866, at \*14 (S.D.N.Y. July 11, 2014)), *aff'd

sub nom*, 698 F. App'x 36 (2d Cir. 2017).  "[T]o prevail on a retaliation claim under the

NYCHRL, the plaintiff must show that she took an action opposing her employer's

discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely

to deter a person from engaging in such action."  *Mihalik*, 715 F.3d at 112 (internal citations

omitted).

By contrast, the prima facie case under the NYSHRL requires Plaintiff to show "(1) that

she participated in a protected activity [known to defendants], (2) that she suffered an adverse

employment action, and (3) that there was a causal connection between her engaging in the

protected activity and the adverse employment action."  *See Gorzynski v. JetBlue Airways Corp.*,

596 F.3d 93, 110 (2d Cir. 2005).  For the purposes of a NYSHRL claim, "material adverse

actions are 'employer actions that would have been materially adverse to a reasonable employee

or job applicant such that they could well dissuade a reasonable worker from making or

supporting a charge of discrimination.'"  *Schaper*, 408 F. Supp. 3d at 391 (alteration marks

omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).

A plaintiff may establish the requisite causal connection by demonstrating that the adverse employment action he suffered occurred "not too long" after he participated in protected activity.  *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 391, n.59 (2d Cir. 2020) ("five months is not too long to find the causal relationship") (collecting cases).  There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship."  *See Summa*, 708 F.3d at 128.  Rather, a court is "to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases."  *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (internal quotation marks and citation omitted); *see, e.g.*, *Summa*, 708 F.3d at 128 ("compar[e] *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir.1990) (finding a lack of evidence that an adverse action, taken three months after the plaintiff's EEOC complaint, was in response to the plaintiff's protected activity) with *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45–46 (2d Cir.1980) (finding that the lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection)).").

"Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action."  *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001); *Chen*, 805 F.3d at 75–76 (under NYCHRL, "defendant then has the opportunity to offer legitimate reasons for its actions.").  "If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination."  *Chen*, 805. F.3d at 76 (internal citation and quotation marks omitted); *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) ("If the employer carries

that burden, then the burden shifts back to the plaintiff, who must establish 'that the employer's action was, in fact, motivated by discriminatory retaliation.'" (quoting *Raniola*, 243 F.3d at 625)).

b. Application

As an initial matter, there is insufficient evidence to allow Plaintiff to proceed on his retaliation claims against Hilaire.[14]  Although there is evidentiary value to Hilaire's supposed statement to Plaintiff telling him to cease his complaints against Rochon or Mbuyi or "we'll get you", (Mildner Decl. Ex. QQ, at ELGALAD_D001398–99), there is nothing in the record suggesting that Hilaire was involved in any legally-material adverse action against Plaintiff. Hilaire merely gave Plaintiff a slightly negative performance evaluation once in October of 2015. (Mildner Decl. Ex. AA.)  There is no evidence that demonstrates that Hilaire even knew that Plaintiff had made complaints of discrimination against any Defendant at the time of that October 2015 evaluation.  This lack of knowledge and qualifying adverse action means both the NYSHRL retaliation claim and the NYCHRL retaliation claim must fail as against Hilaire.  *See Gorzynski*, 596 F.3d at 110; *Corrado*, 164 F. Supp. 3d at 25–26.

Plaintiff meets his prima facie case of retaliation under the NYSHRL against Rochon and Mbuyi.  He engaged in protected activity as early as October 27, 2014, when he told Rochon that Mbuyi discriminated against him, and on November 19, 2014, when he wrote an email to Rochon saying Mbuyi had been discriminating against him.  (Elgalad Exs. Q, R.)  The record suggests Mbuyi knew of Plaintiff's complaints of discrimination at least as early as December

---

[14] I address the claims against Hilaire but recognize that the claims cannot proceed in light of his death and the failure to substitute. Specifically, since it is not clear that the filing of the suggestion of death, (Doc. 52), is in compliance with FRCP 25(a), I address the claims against Hilaire in full.  *See Stephens v. Am. Risk Mgmt. Inc.*, No. 89 Civ. 2999, 1995 WL 479438, at *2 (S.D.N.Y. Aug. 14, 1995) ("Rule 25(a)'s 90-day time period . . . can only be triggered by formal service of a suggestion of death.")

16, 2014, since that was the day Mbuyi responded to the email Plaintiff sent to Rochon mentioning the "discrimination issue" Plaintiff was having that led him not to "want to be alone with Mr. Mbuyi."  (Mildner Decl. Ex. U.)

With regard to the adverse action element, Plaintiff satisfies this element because, starting immediately with Mbuyi's December 16, 2014 email, Plaintiff was subjected to a string of disciplinary meetings and a medical evaluation.  Furthermore, around the same time that Mbuyi was interviewed by OEO investigators regarding Plaintiff's formal discrimination complaint against him in early March of 2015, (Elgalad Ex. DD), Rochon and Mbuyi began exchanging emails that resulted, ultimately, in the June 1, 2015 disciplinary letter added to Plaintiff's employment file that Plaintiff subsequently had expunged, *see supra* Pt. I.C.  There were also a string of disciplinary letters added to Plaintiff's employment file in 2016 shortly after Hilaire told Plaintiff to cease his pursuit of his discrimination charges against Mbuyi and Rochon, (Mildner Decl. Ex. B, at 22:4– 23:14; *see supra* Pt. I.D), a statement that could be viewed as a not so subtle warning to stop or else.  Reviewing the record in the light most favorable to Plaintiff, as I must, *Coughlin*, 64 F.3d at 79, I find that the record could reasonably support the inference that Mbuyi and Rochon acted in a manner designed to "dissuade a reasonable worker from making or supporting a charge of discrimination."  *Schaper*, 408 F. Supp. 3d at 391 (citation omitted). After all, even if one were to consider any particular action taken against Plaintiff as minor, the sheer volume of them appears to have taken substantial amounts of time for Plaintiff to deal with almost daily and thus may be fairly said to have transformed the nature of his employment.

Defendants argue that "[m]any of Plaintiff's alleged adverse actions are temporally far removed from any protected activity," (MSJ 18.)  I disagree.  *See Summa*, 708 F.3d at 128 (explaining there is no "bright line to define the outer limits beyond which a temporal

relationship is too attenuated to establish a causal relationship.").  Here, there are multiple instances in the record where, after some event would have brought Plaintiff's discrimination allegations to the forefront of Mbuyi's and Rochon's minds, Mbuyi and Rochon took further action against Plaintiff, and usually within a month or two of when they had reason to think about Plaintiff's allegations.  This apparent tit for tat response by Mbuyi and Rochon is in stark contrast to cases where an employee "suffered" acts that "were part of an extensive campaign of discipline already underway when she made her first complaint" of discrimination.  *Cf. Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 243 (E.D.N.Y. 2015).  For example, Rochon scheduled Plaintiff for a medical examination less than two months after the December 2014 emails about Plaintiff's discrimination concerns with Mbuyi.  (Mildner Decl. Ex. U; Elgalad Ex. V.)  In mid-February and early March of 2015, OEO investigators interviewed Mbuyi and Rochon about Plaintiff's formal discrimination complaint against Mbuyi.  (Elgalad Exs. BB, DD.)  In early March 2015, Rochon directed Mbuyi to close out the 2013 verbal abuse charge against Plaintiff.  (Elgalad Ex. F.)[15]  I will not elaborate further on the other temporally-proximate examples of actions taken against Plaintiff, as these alone are enough to meet Plaintiff's burden on this first step of the analysis.

Defendants have met their burden of production at step two of the analysis:  they "proffered" evidence amounting to Plaintiff's "poor work performance" and "bad behavior" as underlying the various actions to which Plaintiff was subjected.  *Kwan*, 737 F.3d at 845.  This is enough to shift the burden back to Plaintiff.  *Id.*

Plaintiff has met his burden at step three of the analysis for the purposes of opposing

---

[15] As noted, Mbuyi wrote he found the verbal abuse charge substantiated and added a letter to Plaintiff's employment file reflecting the charge, (Mildner Decl. Ex. W), but he also indicated in another document that "allegation was unsubstantiated" (Elgalad Ex. G, P-241).

summary judgment, as the record demonstrates "shifting and somewhat inconsistent explanations" for Defendants' actions towards Plaintiff. *See id.* at 846.  For example, it is not clear why Mbuyi decided to issue the June 1, 2015 letter to Plaintiff's file and check the box on the OSI form stating that the charge was substantiated despite Mbuyi's own conclusion in another document that the underlying charge was unsubstantiated.  *See supra* Pt. I.C.  Defendants do not even attempt to explain why Rochon drafted two separate letters—dated months apart—ordering Plaintiff to undergo a medical examination.[16]  Moreover, Mbuyi himself went out of his way to call a student to his office in 2016 and have her "write a statement" about Plaintiff. (Elgalad Ex. AF, at 265:4–24.)  This statement served as the basis for many of the charges Plaintiff faced in 2016.

Accordingly, although a jury may conclude that much of the discipline Plaintiff faced was for legitimate reasons, a jury could also reasonably find that the discipline was "pretextual." *See Kwan*, 737 F.3d at 847.  A jury could conclude that, because Rochon and Mbuyi did not like that Plaintiff was complaining about discrimination, they waged a campaign to build a record against him that could "lead to termination of [his] employment," (*See* Elgalad Ex. OO (collecting several of the 2016 disciplinary letters added to Plaintiff's employment file)), a campaign that in fact ended with Plaintiff's reassignment to ATR.

Because Plaintiff's NYSHRL retaliation claims against Mbuyi and Rochon survive summary judgment, so too do his NYCHRL claims.  *See Schaper*, 408 F. Supp. 3d at 394; *cf. Atkinson*, 2022 WL 137634, at *16.

---

[16] *See* Doc. 92, at 15 (arguing that Rochon's signed November 24, 2014 letter ordering a medical examination predates Rochon's learning about discrimination complaints against Mbuyi, but failing to account for either Plaintiff's email to Rochon about discrimination in October of 2014 or the unsigned letter dated January of 2015 that Rochon gave to Plaintiff regarding the medical examination.)

**V.**   **Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Specifically, Defendants' motion for summary judgment dismissing Plaintiff's § 1981 claims against DOE and Mbuyi is GRANTED.  Defendants' motion for summary judgment dismissing Plaintiff's NYCHRL and NYSHRL discrimination claims against Rochon, Mbuyi, and Hilaire is GRANTED.  The claims against Hilaire are also dismissed pursuant to Federal Rule of Civil Procedure 25(a)(1).  Defendants' motion for summary judgment dismissing Plaintiff's NYSHRL and NYCHRL retaliation claims against Mbuyi and Rochon is DENIED.  No claims remain against DOE or Hilaire.

All federal claims have been dismissed.  However, pursuant to 28 U.S.C. § 1367, and in light of the judicial resources utilized on this case, I shall exercise my discretion to retain jurisdiction over the surviving NYCHRL and NYSHRL claims.

Plaintiff is advised that, because his case has made it beyond the summary judgment stage, he may be able to have pro bono counsel appointed to assist him with his case.  *See Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 172 (2d Cir. 1989) (per curiam); *Hodge v. Police Officers*, 802 F.2d 58, 60-61 (2d Cir. 1986).  Plaintiff may move for the appointment of pro bono counsel by letter motion.  Alternatively, Plaintiff may find it useful to visit the Court's webpage about proceeding pro se in this District, which is available at https://nysd.uscourts.gov/prose?clinic=, or he may wish to contact the NYLAG Legal Clinic for Pro Se Litigants at 212-659-6190.

The Clerk of Court is respectfully directed to close the open motion at docket number 81 and to email a copy of this Opinion & Order to pro se Plaintiff.

SO ORDERED.

Dated:   February 14, 2024
       New York, New York

                                Vernon S. Broderick
                                United States District Judge